The **SOUTH BEND CLINIC**, Plaintiff,

v.

**William E. PAUL, D.D.S., Defendant.**

No. S84–363.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 15, 1987.

Arthur A. May, South Bend, Ind., for plaintiff.

Alan H. Goldstein, Donna Bays-Beinart, Indianapolis, Ind., Norman H. Goldman, Highland, Ind., David M. McTigue, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The jurisdiction of this court is based on diversity of citizenship under Title 28 U.S.C. §§ 1332 and 1441. It is undisputed that a basis for such jurisdiction exists.

The evidence in this case was heard in South Bend, Indiana, on December 1 and 2, 1986 and final arguments were heard on the morning of December 4, 1986. Pursuant to the mandates of the resolution of the

Judicial Council for the Seventh Circuit dated October 4, 1984, supplemental briefs were filed simultaneously on the December 22, 1986. This case was tried by highly competent and very experienced trial counsel and the written briefs tendered are excellent. Their briefs have been most helpful to the court.

There is no dispute here that the substantive law of Indiana governs under the principles laid down in *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The basic outlines of the evidence presented in the trial are not in serious dispute but the battleground appears to be in the application of the substantive law of Indiana in the area of liquidated damages in a restrictive covenant.

The South Bend Clinic is located in South Bend, Indiana, and has a historic existence of some seventy (70) years in what became to be called group practice. It is a partnership of physicians and dentists with various professional specialties. Dr. William E. Paul is a licensed dentist who has completed all of the basic requirements for a dental license in the State of Indiana plus additional requirements that qualify him to practice oral and maxillofacial surgery.

Dr. Paul's origins were in the area of Columbus, Indiana, and prior to his association with The South Bend Clinic he had not lived or practiced his profession in the immediate environs of South Bend, Indiana. While still in his residency program in oral surgery on November 24, 1978, he signed a so-called Associate Agreement which is now identified as Appendix A hereto, which Associate Agreement became effective November 1, 1979. Under that Associate Agreement, the defendant was to receive compensation as an associate of the Clinic, to be determined in the same manner and method as was used by the Clinic in determining the compensation of a partner under the Partnership Agreement of The South Bend Clinic which was dated June 14, 1968. The Clinic guaranteed Dr. Paul a minimum compensation of Forty Thousand Dollars ($40,000.00) for a twelve months period. As is readily apparent from a simple facial examination of the aforesaid Associate agreement it did not contain any restricted covenant or provision for liquidated damages. On this very point Dr. Paul's quibbling and unbelievable testimony seriously undermined his credibility as a witness as this court saw, observed and heard him. It is most difficult for this court to comprehend that a person of Dr. Paul's obvious intelligence, education and sophistication would come to believe that there was a restrictive covenant or a liquidated damage provision in the aforesaid Associate Agreement when there plainly was not.

The 1968 Partnership Agreement was modified in 1974 as follows:

> Any member may resign and withdraw as a member of this partnership at any time upon giving written notice to the Board of Trustees hereto, provided, however, that any partner who resigns, retires, becomes disabled or withdraws from the partnership agrees that he will not practice medicine or surgery for a period of one year from the effective date of resignation, retirement, disability or withdrawal within the area contained in a circle drawn with a radius of fifty miles of the location of the main building used and occupied by the partnership or agrees that he will pay in cash to the partnership an amount equal to fifty per cent (50%) of his earnings for the fiscal year next preceding the year of resignation or withdrawal, or the sum of Twenty-five Thousand Dollars ($25,000.00), whichever is the larger, as liquidated damages, as may be determined by a majority of the remaining members and provided further that both the restriction and the liquidated damages may be waived if a majority of four-fifth (4/5ths) of the remaining members so agree upon the request of such resigning, retiring, disabled or withdrawing partners. (Plaintiff Exhibit 13).

Dr. Paul was given a copy of the 1968 Partnership Agreement and the 1974 amendment thereto and Dr. Paul testified

that he had these documents reviewed by an attorney who did legal work for his father in Columbus, Indiana, and that it was specifically pointed out to him that said documents contained a restrictive covenant and a liquidated damage provision.

At this point it is also important to emphasize that at no time in this case has Dr. Paul challenged either the time or space requirements of the aforesaid restrictive covenant. The focus centers on the provisions liquidated damages as will soon become apparent.

It should also be emphasized that counsel for the defendant explicitly precluded any assertion of claims under any federal statutes dealing with antitrust or restraint of trade and has not asserted here that any of the agreements between the defendant and the Clinic were the product of fraud in the inducement or fraud in the inception.

■ On December 30, 1980, Dr. Paul executed a full Partnership Agreement by which he agreed to be bound by the 1968 Partnership Agreement and its supplements and amendments, including the 1974 amendment above quoted which contained the restrictive covenant and liquidated damage provision here in issue. This court finds specifically that when Dr. Paul executed the Partnership Agreement he was well aware that he was bound by the restrictive covenant and the liquidated damage provision.

In October 1982, a new Partnership Agreement of The South Bend Clinic was entered into and signed by all of the partners of The South Bend Clinic including Dr. Paul. That new Partnership Agreement contained in it verbatim the 1974 amendment to the 1968 Partnership Agreement including the restrictive covenant and the liquidated damage provision.

During his tenure at The South Bend Clinic, Dr. Paul practiced with a Dr. David Harris in the oral surgery department and proved to be an enormous and immediate financial success. In 1980, the first full year as an associate at the Clinic Dr. Paul produced $342,933.67 with an income of $159,958.15.

On December 5, 1983, Dr. Paul submitted his letter of resignation as a member of the partnership to become effective December 29, 1983. At a partnership meeting on December 23, 1983, an unsuccessful effort was made to waive the restrictive covenant for payment of seventy-five percent (75%) of the amount due and owing under the liquidated damage provision thereof. This piece of evidence is only relevant to indicate that the Clinic in no sense can be said to have waived the provisions of the restricted covenant and the liquidated damage provision.

On December 29, 1983 Dr. Paul established his practice of oral surgery at 707 North Michigan Street in the city of South Bend, Indiana, within one mile of the location of the Clinic.

In the calendar year 1982 Dr. Paul earned $219,286.00. On January 5, 1984 a demand letter was sent from The South Bend Clinic to Dr. Paul, demanding that he pay the sum of $109,643.00 which was due and owing under the terms of the liquidated damage provision. That figure is arrived at by taking 50% of $219,286.00.

■ The basic substantive law of Indiana is found in the Supreme Court's decision in *Raymundo v. Hammond Clinic Association,* Ind., 449 N.E.2d 276 (1983) as followed in a highly relevant factual context soon thereafter by the Court of Appeals of Indiana in *Harris v. Primus,* Ind.App., 450 N.E.2d 80 (1983). The patient service of Dr. Paul while he was a member of the partnership in 1982 and 1983 was within and beyond the 50 mile radius of The South Bend Clinic. The time and space provisions of the restrictive covenant are reasonable under the law of Indiana. This court must follow the mandates of Rule 52 of the Federal Rules of Civil Procedure in making findings and conclusions and chooses to do so in this narrative form.

The basic legal issue to be determined by these largely undisputed facts relates to the enforceability of the liquidated damage provision. Both parties have provided an

excellent comprehensive and in-depth analysis of the ancient and modern Indiana substantive law that arguably relates to this case. Notwithstanding the antiquarian interest in the Nineteenth Century development, the court will simply indicate that it has read the briefs and the cases cited, including *Duffy v. Shockey*, 11 Ind. 70 (1858); *Martin v. Murphy*, 129 Ind. 464, 28 N.E. 1118 (1891); *Merica v. Burget*, 36 Ind.App. 453, 75 N.E. 1083 (1905). These cases are an important part of the basic conceptual backdrop of the last word from the Supreme Court of Indiana in *Raymundo v. Hammond Clinic Association.*

Dr. Paul's able and talented counsel makes a very sophisticated effort to argue around both *Raymundo* and *Primus* but with all due deference he has failed. When one examines both of those cases and the reasoning and result, the position of the Clinic made here is supported there. The citation in *Raymundo* of *Beiser v. Kerr*, 107 Ind.App. 1, 20 N.E.2d 666 (1939) sets out the issue and the standard relating thereto that this court must apply in deciding this case. The Supreme Court of Indiana ruled in *Raymundo* that notwithstanding the conceptual inhibitions with reference to restrictive covenants in general, the courts will generally uphold a clause for liquidated damages unless the amount is grossly disportionate to the loss and far beyond any possible damages that could be incurred. The Supreme Court of Indiana emphasized the loss of production suffered by the Clinic when Dr. Raymundo left and the losses of revenue pending his replacement. In this case there is substantial and believed evidence that The South Bend Clinic lost the production of Dr. Paul as a result of his resignation. He left open office and examining room space. There is credible evidence that it would take one to one and one-half years to recruit and secure a professional replacement for Dr. Paul. During that time the space at least would be unproductive and in non-use. In 1982 Dr. Paul produced $497,368.80 in revenue for the partnership and for the year 1983 he had production of $506,337.29. In 1982 Dr. Paul had gross production of $497,368.80 and received income in the amount of $228,589.00.

In *Raymundo* at 449 N.E.2d 284, it is stated:

> The Clinic consisted of more than fifty physicians functioning in essentially all areas of the medical practice. Although we like to think of such institutions as altruistic and benevolent health care providers, realistically we must recognize that they are also business ventures operating in the free enterprise system. Obviously, at the time the agreement was entered into, the Clinic anticipated some financial gain from Dr. Raymundo's affiliation as a partner for an agreed period of five years. It was altogether reasonable to assume that if he did not complete the term, it would encounter definite expense and losses of revenue pending his replacement. It is also reasonable to assume that patients, whom the Clinic would expect to serve, for a fee, would be lost. The amount of such anticipatory expenses and losses is not susceptible of determination—either before or after the fact. Yet they are almost certain to occur. The uncontroverted facts are that in the year 1974 the Clinic had gross revenues of $8,277,771.00 and that of this, the orthopedic department, of which Dr. Raymundo was one of three physicians, produced $384,595.00. It was also uncontroverted that of the last mentioned sum, Dr. Raymundo produced $103,262.00, although he was attached to the Clinic for but slightly over half of the year. In light of the enormity of such income and expense figures, it cannot be said that the agreed sum of $25,000.00 exceeded the pale of liquidated damages and was, in fact, a penalty.

Given the economics that inheres in this professional relationship this court finds that the provision is reasonable, or at least this court is not required to find as a matter of law that it is unreasonable.

In *Harris v. Primus*, 450 N.E.2d at page 86 it says:

Where the language of a contract is plain as to the intent of the parties, that language is conclusive. Dr. Primus is a well-educated and well-informed individual who consulted with her counsel before signing the agreement. She knew she was bound by the terms of the partnership agreement and its amendments. The intent of the parties at the time the contract was made is exemplified in the record. The minutes of the trustees' meeting of November 8, 1977 state that Dr. Primus agreed to pay the $25,000.00 on a time-payment basis of approximately $1,000.00 per month. In subsequent meeting minutes there appears a counter offer from Dr. Primus to pay $10,000.00. There is no question about what the parties intended in so far as the liquidated damages provision and there is no evidence to support a finding that their intent was otherwise.

At the very end of that opinion at page 86 a single sentence is found: "There is no question about what the parties intended in so far as the liquidated damages provision and there is no evidence to support a finding that their intent was otherwise." And so it is here. The reasoning and final result in both *Raymundo* and *Harris v. Primus* support that announced here.

This court has determined to exercise its discretion and *not* award prejudgment interest.

Judgment shall enter for the plaintiff, The South Bend Clinic, and against the defendant, William E. Paul, D.D.S., in the sum of $109,643.00 and costs are assessed against the defendant. SO ORDERED.

## APPENDIX A

### ASSOCIATE AGREEMENT

WHEREAS the undersigned South Bend Clinic, hereinafter known and referred to as "Clinic" is a partnership engaged in a group and collective practice of medicine and surgery by it partners; and

WHEREAS WILLIAM E. PAUL, D.D.S. is a duly licensed physician/dentist in and for the State of Indiana, and is hereinafter known and referred to as "Associate"; and

WHEREAS the Clinic has extended to the Associate an invitation to engage with them in the practice of medicine and dentistry as an associate of said partnership; and

WHEREAS the Associate has accepted and does agree to become an associate of the Clinic in the practice of medicine and/or surgery and/or dentistry pursuant to the terms and conditions hereinafter set-forth:

1. That this agreement between the Associate and Clinic shall commence and become effective on the 1st day of November, 1979, and shall continue in full force and effect until terminated in accordance with the terms and conditions hereinafter set-forth.

2. That this associate agreement may be terminated in the following manner:

(a) by written mutual agreement of the parties;

(b) that upon violation of any of the terms of this agreement said party shall give written notice to the other party of such terms and conditions of this agreement which are being violated; and if, within thirty (30) days after receipt of said written notice, said violation or breach of the terms of this agreement have not been corrected, then said party giving such written notice shall have the right or option to terminate this agreement. Such right of termination shall not effect any other rights a party may have by reason of any breach of this agreement.

(c) unless sooner terminated under the provisions of paragraphs (a) and (b) above, that this agreement shall terminate on the earlier of 1) the date of the written notice of either party of his intent to terminate this agreement, 2) the date of signing of the partnership agreement by the associate, or 3) thirteen months from the effective date entered in paragraph 1.

3. It shall be the duty of said Associate to devote his entire professional time and effort to the business of the partnership, and in connection therewith, to perform

such other services and duties as may be prescribed from time to time by the Board of Trustees.

4. It shall also be the duty of said Associate to pay promptly his own debts and obligations and not to incur any obligations as surety, guarantor or endorser for another without the written consent of the Board of Trustees.

5. It shall also be the duty of said Associate to conduct himself, in his professional, private and public life so as not to injure the reputations and standing of the Clinic in the community or his own reputation or standing.

Said Associate shall not engage in any business other than the business of the Clinic nor accept any public office or political appointment without the written consent of the Board of Trustees.

6. Said Associate shall promptly account for and pay over to the Board of Trustees daily, all receipts derived from the practice of his professional services, and also each day, make detailed report of all professional services rendered by him so that proper entry thereof may be made upon the books kept by the Board of Trustees.

7. The Associate shall receive compensation, as an associate of the Clinic, to be determined in the same manner and method that is used by the Clinic in determining the compensation of a partner of the Clinic in accordance with the Partnership Agreement of the Clinic date June 14, 1968, as set-forth in paragraph 34, beginning on page 11 of said Partnership Agreement entitled "Distribution and Allocation of Net Income". The Clinic does hereby agree the minimum compensation which the associate shall receive shall be $40,000 for a 12 month period or on the basis of $3,333.33 per month for any fractional part thereof.

8. That this associate agreement may be modified by written agreement of the parties.

9. That by the execution of this Associate Agreement the Associate does not become a partner in the Clinic nor does he have any right or responsibilities as a partner except as contained within this agreement.

DATED this 24 day of November, 1978.

s/ William E. Paul, D.D.S.
WILLIAM E. PAUL, D.D.S.
Associate
THE SOUTH BEND CLINIC
/s/ Administrator